**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MANUEL JESUS LOPEZ,
Individually and on behalf of his family,
and NOEL GONZALEZ,
Individually and on behalf of his family,

                Plaintiffs,

v.                                              CIV 10-0059 MCA/WPL

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF OTERO, et al.

                Defendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon *Defendants' Motion for Summary Judgment*. [Doc. 22]. Defendants seek summary judgment in their favor on Plaintiffs' federal claims. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants the *Motion*.

**I.**        **BACKGROUND**

In their *Original Petition for Damages* [Doc. 1] (Complaint), Plaintiffs Manuel Jesus Lopez (Lopez) and Noel Gonzalez (Gonzalez) allege that Otero County and the Otero County Sheriff's Department have received substantial funds from the United States Department of Homeland Security under a program called "Operation Stonegarden." *See* Complaint ¶ 8, at 3. According to Plaintiffs, "[u]nder the pretext of this program," Defendants "engaged in a number of operations meant to identify and detain or arrest Hispanics for questioning by federal immigration officials," and "repeatedly targeted Hispanic families in Otero County including Plaintiffs by confronting them in their homes and on the streets without reasonable suspicion or any evidence of criminal conduct

1

other than Plaintiffs' race or ethnicity and Defendants' assumptions about their national origin." *See id.* ¶¶ 9 & 13, at 3-5. Plaintiffs allege that on February 9, 2008, they personally became caught up in Defendants' operations when Lopez and Gonzalez were driving home with their families and Defendant Deputy Rob Hansen (Hansen) began following them without probable cause or a reasonable suspicion of any criminal conduct. *See id.* ¶ 10, at 3-4. According to Defendants, at 8:25 p.m. on that date, Hansen "was on patrol in Chaparral, NM," when he observed Lopez committing traffic violations. He observed that the license-plate light on Lopez' vehicle was not functioning and Lopez was speeding. *See* Doc. 22, Ex. A ("Incident Report") at 5-6. Hansen had been driving in the opposite direction of Lopez but, after seeing that the license plate light was out, he turned his vehicle around and followed Lopez' vehicle. *See id.* He pulled the vehicle over in what turned out to be Lopez' driveway.[1] Because Lopez did not believe Hansen was targeting him, he got out of the vehicle and approached Hansen to speak with him. *See* Doc. 28, Ex. 6 (Doc. 28-6) ("Lopez Affidavit") at 1. Hansen demanded that Lopez get back into the vehicle. *See id.* Lopez re-entered the vehicle. *See id.* Hansen then instructed Lopez to step out of his vehicle. *See id.* Concerned for

---

[1]Lopez states that as he turned the vehicle into his driveway, Hansen turned on the overhead lights. *See* Lopez Affidavit at 1. In his affidavit, Gonzalez states "upon entering my cousin's driveway, I noticed an Otero County Sheriff put his lights on." Doc. 28, Ex. 9 (Doc. 28-9) at 1. In their response, Plaintiffs state that the emergency equipment was activated after they were in the driveway. *See* Doc. 28 at 5. Hansen states "[w]hen I activated my lights, the van pulled into a fenced yard at 215 Divine." Incident Report at 5. Plaintiffs assert that the question of the timing of when the lights were activated is critical to the analysis. However, the timing of the lights being activated and whether Plaintiffs were on private or public property is not relevant to the analysis. When an officer is in hot pursuit of a suspect, his authority is not limited to his jurisdiction. *See Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990). In such pursuit, the officer may enter private property of a person, particularly in an area where there is not an expectation of privacy, such as a driveway. *See United States v. Santana*, 427 U.S. 38, 42 (1976). That the pursuit ends almost simultaneously with when it begins does not prevent the pursuit from being categorized as a "hot pursuit." *See id.* at 43. Hansen observed Lopez commit a traffic infraction and Hansen possessed the authority to stop Lopez on private property to charge him with the violation of those misdemeanors.

his safety, Hanson placed handcuffs on Lopez. *See* Incident Report at 5. The passengers in the vehicle refused to comply with Hansen's directions. *See id.* Lopez asserts that Hansen refused to explain to him why he was being detained. *See* Lopez Affidavit at 2. Hansen contends that he tried to explain to Lopez why he was being detained but Lopez and that the other persons in the vehicle were simultaneously yelling at him. *See* Incident Report at 5.

After Hansen put Gonzalez back in the vehicle in an attempt to control the situation until other officers got there, Gonzalez again stepped out of the passenger side of the vehicle while making a phone call. *See id.* Hansen told Gonzalez to hang up because Hansen did not know who he was calling, but Gonzalez refused to hang up or to follow Hansen's other orders. *See id.* Gonzalez was calling "911 for help." Doc. 28, Ex. 9 at 1 (Gonzalez Affidavit). Back-up deputies subsequently arrived, and "Defendant Deputy Figueroa and Defendant Deputy Green [got] out of their vehicle pointing their guns at [their] families and young children." . Gonzalez and Lopez were placed under arrest and transported to Alamogordo. *See* Lopez Affidavit at 2. Lopez was cited for having a malfunctioning license plate light and for speeding. *See id.* He pleaded guilty to these two traffic violations. *See id.* at 3. Both Lopez and Gonzalez were charged with resisting, evading or obstructing an officer pursuant to NMSA 1978, § 30-22-1. *See* Incident Report at 3. At the conclusion of their trial, Gonzalez was convicted of the charge because he "refused to put [his] cell phone down when ordered," but Lopez was acquitted of the charge. *See* Doc. 22, Ex. C & D.

Upon Defendants' Partial Motion to Dismiss (Doc. 4), on August 16, 2010, the Court dismissed Count IV of the Complaint pertaining to Plaintiffs' substantive-due-process claims under the Due Process Clause of the Fourteenth Amendment. *See* Doc. 25. Defendants filed a Motion to Stay Proceedings pending the outcome of their motion to dismiss, which the Court granted. *See* Docs. 23 and 34.

## II.   LEGAL STANDARD AND ANALYSIS

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56.  Upon the movant's proper showing that no genuine disputes of material fact exist, the opposing party "'may not rest upon the mere allegations or denials in his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting former FED. R. CIV. P. 56(e)).  An issue of fact is genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party.  *See id.*

Mere assertions or conjecture of factual disputes are not enough to survive summary judgment.  *See Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988).  The party seeking summary judgment has the

> initial burden to show that there is an absence of evidence to support the nonmoving party's case.  Once [the movant] meets this burden, the burden shifts to [the non-moving party] to identify specific facts that show the existence of a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.

*Thomas v. Int'l Bus. Machs*, 48 F.3d 478, 484 (10th Cir. 1995) (citations and internal quotations omitted).  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 322; *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  To warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  *See Celotex*, 477 U.S. at 324.  It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a

motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  *See Hunt v. Cromartie*, 526 U.S. 541, 551-52 (1999).

Plaintiffs bring their federal claims under 42 U.S.C. § 1983, which provides, in relevant part, that

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  In their summary-judgment motion, the Defendants assert that they are entitled to qualified immunity from Plaintiffs' federal claims.[2]

Persons sued in their individual capacity under § 1983 generally are entitled to qualified immunity unless the plaintiff can establish that the defendant's actions violated a specific federal statutory or constitutional right and that the right which they allegedly violated was clearly established at the time of the conduct at issue.  *See Gross v. Pirtle*, 245 F.3d 1151, 1155-56 (10th Cir. 2001).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992), *overruled in part on other grounds by Williamson v. City & County of Denver*, 99 F.3d 1009, 1014-1015 (10th Cir. 1996).  But "officials can still be

---

[2] Plaintiffs also brought "supplemental claims for constitutional violations and tortious acts under the Federal Tort Claims Act and New Mexico Law."  Complaint at 2; and *see id.* at 7-10 (listing five counts regarding state-law claims.).

on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The salient question is whether the state of the law at the time of the incident gave the defendants fair warning that their conduct was unconstitutional. *See id.*

Although the qualified-immunity cases previously required courts to first evaluate the right asserted and then to resolve whether the right is clearly established, the Supreme Court of the United States recently adjusted the analysis. In *Pearson v. California*, 555 U.S. 223, ___, 129 S. Ct. 808 (2009), the Court held that the established analysis—constitutional right first, clearly established second—"should not be regarded as an inflexible requirement." 129 S. Ct. at 813. Therefore, the order of analysis now rests in the district court's discretion. *See id.* (recognizing that district courts "should have the discretion to decide [which] procedure is worthwhile in particular cases"). Nevertheless, in this instance, it is logical to begin the analysis with an evaluation of the asserted constitutional rights because, ultimately, if a plaintiff cannot show that a clearly established constitutional right was violated, the court must grant the defendant qualified immunity. *See Gross*, 245 F.3d at 1156. The Court will address each asserted constitutional right beginning with Plaintiffs' Fourth-Amendment claims pertaining to probable cause.[3]

### A. Seizure, Detention and Interrogation

Plaintiffs assert that the Defendants violated "Plaintiffs' rights under the Fourth Amendment to the United States Constitution . . . by seizing, detaining and interrogating them without reasonable suspicion or probable cause to believe they had been engaged in criminal activity." Complaint ¶ 15,

---

[3]Because Plaintiffs' substantive-due-process claims have already been dismissed, *see* Doc. 25, that claim will not be discussed herein.

at 5.[4] They further allege that "Defendant Board and its officials, as a matter of custom and policy, acting with deliberate, conscious and callous indifference to the right to be free from unlawful search and seizure and illegal detention, authorized, tolerated, and institutionalized the practices and ratified the legal misconduct, described herein, as part of Operation Stonegarden." *Id.* ¶ 16, at 5. Plaintiffs contend "none of this would have ever happened if Defendant Deputy Hansen had not conducted a stop without reasonable suspicion or suspicion of criminal activity." Doc 28 ¶ 8, at 7. They assert that because reasonable suspicion or probable cause are in dispute, summary judgment cannot be granted. *See* Doc. 28 at 14. Defendants contend that they had contact with Plaintiffs because Lopez violated New Mexico law. *See* Motion at 4; Doc. 35, Ex. 1(Doc. 35-1) ("Hansen Affidavit") ¶¶ 4-7, at 1-2. They argue that then the Plaintiffs "committed the crimes of evading and obstructing an officer" also in violation of New Mexico law. Motion at 6. They assert that an officer may effectuate an arrest without a warrant of an individual guilty of a misdemeanor if committed in the officer's presence and that Lopez has admitted that he committed the traffic violations. *See id.* Defendants assert that their contacts with the Plaintiffs and their subsequent arrests were "reasonable and appropriate under the circumstances." *Id.*

A traffic stop is evaluated according to the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). *See Amundsen v. Jones*, 533 F.3d 1192, 1198 (10th Cir. 2008). Our Circuit has mandated a two-step inquiry, which considers (1) "whether the officer's action was justified at [the stop's] inception," and (2) "whether the officer's subsequent conduct was reasonably related in scope to the circumstances that justified the interference in the first place." *Id.* (alteration in original) (internal quotation marks and citation omitted). With respect to the first prong of the analysis, "[a]n officer

---

[4]Because Defendants have brought their motion only on Plaintiffs' federal claims, references to the state claims will be overlooked for purposes of this Order.

may initiate a traffic stop once he has 'reasonable suspicion that criminal activity is, has, or is about to occur.'" *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) (quoting *United States v. Copening*, 506 F.3d 1241, 1246 (10th Cir. 2007)). "Reasonable suspicion arises when an officer of reasonable caution has a particularized and objective basis for suspecting the person stopped of criminal activity judged against the totality of the circumstances." *United States v. Pena-Montes*, 589 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citation omitted). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005) (citation and internal quotation marks omitted). In New Mexico, an officer's observation of an inoperable license-plate light[5] provides a sufficient basis for performing a traffic stop. *See United States v. Marquez-Diaz*, 325 F. App'x 637, 642-43 (10th Cir. 2009).

Once a driver has been pulled over for a traffic violation, a police officer's additional request that the driver get out of his car is only a *"de minimus"* intrusion into the driver's personal liberty. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).

> The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a "petty indignity."

*Id.* (citing *Terry,* 392 U.S. at 17). "What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id*. Under the undisputed facts, Defendants' detention and interrogation related only to the traffic violations, thus these delays and the Defendants' subsequent custodial arrest of Plaintiff is, therefore, also lawful under the Fourth

---

[5]*See* N.M. Stat. § 66-3-805 (1978).

8

Amendment because, undisputably, the officer had probable cause to initiate the traffic stop. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender").

While Plaintiffs contend that the citations were unfounded, they have not shown that Hansen lacked probable cause to stop the vehicle. Hansen states that Lopez was stopped because he violated two traffic laws. *See* Hansen Affidavit ¶¶ 3-7, at 1-2. Lopez does not dispute that he was charged with speeding and for having an inoperable license-plate light. *See* Lopez Affidavit at 2. Rather, he and Gonzalez contend that Hansen could not have seen the malfunctioning light because he was driving in the other direction. While Lopez asserts that he was not speeding, *see* Doc. 28, Ex. 6 at 2 (Doc. 28-6 at 2), he, nevertheless, pleaded guilty to both traffic-violation charges. In so doing, he acknowledged that he committed both traffic violations. He can not now dispute that Hansen had probable cause to stop his vehicle.[6]

### B. Equal Protection

Plaintiffs contend that they were targeted because of their race and/or national origin and that Defendants "deprived [them] of their rights to equal protection of the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." Complaint ¶ 18 at 6. They further argue that Defendants acted with "racially discriminatory intent and effect" and that their actions constitute "race and national origin discrimination in violation of

---

[6] Plaintiffs here argue that Lopez pleaded guilty to the traffic violations in response to an offer by Hansen to have the criminal charges dismissed or have the bond reduced. *See* Doc. 28 ¶ 6, at 6, at 11, and Ex. 6 at 2 (Doc. 28-6 at 2). Plaintiffs also assert that Lopez was coerced into pleading guilty to the traffic violations. *See id.* ¶ 6, at 6. If these facts are true, the proper time for Plaintiffs to have challenged the charges and the plea or to assert the agreement to dismiss would have been during the trial on the criminal charges or any appeal therefrom.

9

the Equal Protection Clause." *Id*. ¶ 19 at 6. Lopez speculates that "Hansen had a clear view of at least my wife and I in the front seat." Lopez Affidavit at 1. He continued "I could see other occupants of other car [sic] at the time of the incident. I also had my windows down and my wife and I were clearly visible. The entire occupants of the van were of Mexican de[s]cent." *Id.* at 2. Lopez further contends that Hansen "immediately made a u-turn after seeing the occupants of [his] vehicle." *Id.* In contrast, Hansen states that "[t]he roadway on which I observed the Plaintiffs' vehicle engage in a traffic violation is not lit and it was 8:25 p.m. and dark. At the time I initiated my contact with Plaintiffs' vehicle, I could not determine the age, gender or race of the driver or passengers." Hansen Affidavit ¶ 4 at 1. Hansen contends "[a]t no time did I initiate any contact with the Plaintiffs on the basis of their race or national origin. My contact with the Plaintiffs was based solely on their violations of New Mexico law." Hansen Affidavit ¶ 7 at 2. Thus, whether Hansen actually saw that Lopez and his wife are Hispanic before he stopped Lopez is disputed.

The Fourteenth Amendment to the United States Constitution prohibits the states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). Although "[r]acially selective law enforcement violates this nation's constitutional values at the most fundamental level," a claim for racially-selective law enforcement draws on "'ordinary equal protection standards.'" *See Marshall v. Columbia Lee Reg'l Hosp.*, 345 F.3d 1157, 1169 (10th Cir. 2003) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)). A plaintiff alleging selective enforcement of the criminal laws must establish that the enforcement of the laws had a "discriminatory effect *and* that it was motivated by a discriminatory purpose." *Armstrong,* 517 U.S. at 465 (emphasis added). "The discriminatory purpose need not be the only purpose, but it must be

a 'motivating factor in the decision.'" *Villanueva v. Carere*, 85 F.3d 481, 485 (10th Cir. 1996) (quoting *Vil. of Arlington Hts. v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977)). The decision-maker must have "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

> To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.

*Marshall*, 345 F.3d at 1168.

In *Marshall*, the plaintiff presented evidence that she was followed by a police officer for several blocks, that the officer made eye contact when the vehicles were stopped at an intersection, that he did not provide a nondiscriminatory explanation for his behavior, that he made cryptic comments referring to drug use, that he made a note of the plaintiff's race on the citation even though no such note was required, and that he abandoned his initial allegations of high speed and weaving. *Id.* at 1169-70. The Court in *Marshall* noted that these facts presented a "close question" regarding discriminatory intent, but that additional facts further supported the plaintiff's allegations. *Id.* at 1170. The plaintiff also provided evidence of the specific officer's behavior during his prior employment which included a statement by the officer's previous employer, contained in a memo, that the officer "failed to treat people fairly and equally under the law." *Id.* In addition, analysis of the officer's past arrest records disclosed a pattern of racial discrimination. *Id.* at 1170-71. All of this evidence, our Circuit held, "may be sufficient to create a triable issue on [the plaintiff's] claim of racially selective law enforcement." *Id.* at 1171.

Such analogous facts are markedly absent in the present case. Plaintiffs here contend that the decision to stop them was based solely on their race or national origin. Nevertheless, there is no evidence proffered that Hansen stopped Plaintiffs because they looked Latino or Hispanic and may, therefore, be illegal immigrants. Doc. 28 at 3. They assert that "[i]t has been Plaintiffs' contentions [sic] in this lawsuit that Defendants would stop vehicles driven by Hispanics under the pretext of a traffic violations [sic] to inquire into their immigration status." *Id.* But there is no evidence that Hansen had a practice of selectively stopping only Hispanic drivers for speeding or for failure to have a license-plate light. Plaintiffs recount no additional facts concerning the encounter, other than the fact all of the occupants of the vehicle were Hispanic. The Court must reject the implication that an absence of evidence would lead a reasonable juror to infer that Hansen was motivated by a racially discriminatory purpose.[7]

As part of their argument, Plaintiffs contend that Otero County's participation in Operation Stonegarden caused Hispanics to be targets of pretextual stops and unwarranted arrests. Plaintiffs, have failed to draw any factual connection between Otero County's participation in Operation Stonegarden and any pretext on the part of Deputy Hansen or any other Defendant in their particular dealings with Plaintiffs. Although Plaintiffs contend that they were unlawfully stopped so that Hansen could inquire into their immigration status, *see id.* at 5, they have provided no facts to indicate that any discrimination occurred. At no time do they allege, for example, that Hansen asked

---

[7] As noted previously, Lopez admitted guilt in the traffic violations charged and Hansen therefore had undisputed probable cause to stop the vehicle, regardless of Lopez's race. "In determining whether a traffic stop is constitutional, the officer's 'subjective intent or good faith do[es] not affect the reasonableness of the stop.'" *United States v. Polly*, 630 F.3d 991, 997 (10th Cir. 2011) (quoting *Orduna-Martinez*, 561 F.3d 1134, 1137 (10th Cir. 2009)). "Accordingly, 'an officer's motive' will not 'invalidate [] *objectively* justifiable behavior under the Fourth Amendment.'" *Id.* (quoting *Whren*, 517 U.S. at 812). Because the stop was justified, Hansen's motive does not bear on the determination of the constitutionality of the stop.

Lopez, Gonzalez or anyone else in the vehicle about their national origin or for identification to prove they were American citizens or otherwise lawfully present. Plaintiffs were not detained for questioning by immigration officials, *see id.* at 12, and they do not contend that they spoke with immigration officials. They have not provided any facts to support a claim that the initial stop was made for any reason other than traffic-law enforcement.[8]

In *Marshall,* our Circuit observed that the standard for establishing a claim for racially selective law enforcement "'is a demanding one.'" 345 F.3d at 1167 (quoting *Armstrong*, 517 U.S. at 463).[9] The Court concludes that Plaintiffs have not met that standard, and accordingly have failed

---

[8]The Court takes judicial notice of the fact that the population of Chaparral, New Mexico, where this stop occurred, is more than seventy-five percent Hispanic. *See* http://www.city-data.com/city/Chaparral-New-Mexico.html. The likelihood that the driver of any vehicle stopped for a traffic violation is Hispanic is great and does not by itself indicate a discriminatory stop.

[9]Plaintiffs attach multiple exhibits to their Response in support of their claims. *See* Doc. 28. Exhibit 1 is the Operations Order Report pertaining to Operation Stonegarden, Exhibit 2 is a Statistical Report from Operation Stonegarden, and Exhibit 3 is a compilation of six Incident Reports from Operation Stonegarden. Although these exhibits may show that traffic stops occurred in Chaparral near the same date that Plaintiffs were detained and that those detained were also turned over to immigration officials, none of these exhibits present evidence that any of the stops where the individuals were turned over to immigration officials were illegal. The exhibits do not demonstrate illegal racial profiling. Exhibit 4 and Exhibit 5, also attached to the Response, are, respectively, an article regarding settlement of an immigration suit and a copy of a Memorandum Opinion and Order written by the Honorable Martha Vázquez, U.S. District Judge, enjoining the defendants, in relation to Operation Stonegarden, from: "Engaging in any stops, searches or seizures, of persons, property or homes, without legal justification," "Conducting unlawful community-wide raids targeting low-income Latino residents in Otero County for the sole purpose of identifying and apprehending undocumented and illegal immigrants," "Engaging in unlawful discriminatory activities and racial profiling for the purpose of identifying and apprehending undocumented and illegal immigrants," and "Engaging in unlawful retaliation, coercion, harassment, threats and intimidation for the purposes of identifying and apprehending undocumented and illegal immigrants." Doc. 28, Ex. 5 (Doc. 28-5) at 10-11. Neither of these two exhibits are relevant to the facts in this case because, here, Lopez was stopped due to his violation of traffic laws, which he admitted occurred by pleading guilty to them, and there is no evidence that anyone in the vehicle was ever asked their immigration status. These exhibits do not provide legal or factual support for Plaintiffs' claims.

to demonstrate that Defendants violated their clearly established right to equal protection under the Fourteenth Amendment. Defendants are entitled to qualified immunity on this claim.

### C. False Imprisonment

The full crux of Plaintiffs' false imprisonment claim is that "Defendants acted with deliberate, callous and reckless intent to falsely imprison Plaintiffs without due process of law." Complaint ¶ 21 at 6. The Complaint is vague as to which events Plaintiffs assert as false imprisonment but it appears to focus on the initial traffic stop. As previously discussed, Lopez pleaded guilty to the traffic violations and therefore admitted that there was probable cause for Hansen to perform a traffic stop and detain the occupants of the vehicle. Accordingly, the claims of false imprisonment under § 1983 fail.[10]

---

[10]If Plaintiffs are trying to assert false imprisonment claims with regard to the arrests, even though the parties dispute whether Lopez initially failed to comply with Hansen's orders, they agree that, when Hansen initiated the stop, Lopez exited the vehicle and approached Hansen unsolicited. Hansen stated that, because he was concerned for his safety, when Lopez again exited the car at his direction, Hansen handcuffed Lopez. *See* Incident Report at 1. This act did not exceed Hansen's authority and Plaintiffs have not indicated it has. Whether Lopez was later convicted of the criminal charge of resisting, evading and obstructing an officer is not a determining factor in whether Hansen was acting reasonably in the circumstances at time. Plaintiffs have not provided any legal authority showing otherwise.

Because Gonzalez was convicted of the criminal charge of resisting, evading and obstructing an officer, under *Heck v. Humphrey*, 512 U.S. 477 (1994), he can not proceed with the false-imprisonment claims based on his arrest.

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* be so invalidated is not recognizable under § 1983.

*Heck v. Humphrey*, 512 U.S. at 486-487 (emphasis in original). Gonzalez has not made such a showing.

14

### D. Conspiracy under 42 U.S.C. § 1985

Plaintiffs contend that "Defendants conspired to violate Plaintiffs' rights secured by the U.S. Constitution, including but not limited to, their right to due process and equal protection." Complaint ¶ 25, at 7. The Supreme Court of the United States recognizes "five broad classes of conspiratorial activity" that § 1985 prohibits. *See Kush v. Rutledge*, 460 U.S. 719, 724 (1983). "Three of the five broad categories . . . relate to institutions and processes of the federal government," *id.*, which are not applicable here where the Defendants are municipal entities and employees. The other two classes of § 1985 claims apply to conspiracies to "obstruct the course of justice in state courts" and to "go in disguise on the highway or in the premises of another." *Id.* at 725 (internal quotation marks omitted). Both of these later categories require an "intent to deprive their victims of the equal protections of the laws," which means that there must be some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspiratorial action," *id.* at 725-26 (internal quotation marks omitted). "[I]n the absence of allegations of class based or racial discriminatory animus, the complaint fails to state a claim under § 1985." *Campbell v. Amax Coal Co.*, 610 F.2d 701, 702 (10th Cir. 1979) (citing *Atkins v. Lanning*, 556 F.2d 485, 489 (10th Cir. 1977). Additionally, to state a valid claim for conspiracy, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (discussing conspiracy under § 1983). "[M]ere conclusory allegations with no supporting factual averments are insufficient; the pleadings must specifically present facts tending to show agreement and concerted action." *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983) (discussing conspiracy under § 1983). As discussed above, despite Plaintiffs' conclusory allegations that the traffic stop occurred as a result of racial profiling, no facts have been presented to support a claim that racial or nationality profiling or

15

discrimination occurred. Plaintiffs also proffers no set of facts showing an agreement and concerted action among the Defendants in the case. Because Plaintiffs present no facts showing race-based animus and an agreement to conspire and concerted action, summary judgment must be granted in favor of Defendants on their claim for violation of § 1985.

### III.    CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment is granted.[11] Because Defendants only requested summary judgment on the federal-law claims in their motion, the state-law claims will be dismissed without prejudice.[12]

**IT IS THEREFORE ORDERED** that Defendants' *Motion for Summary Judgment* [Doc. 22] is **GRANTED** and Counts I-III are DISMISSED with prejudice.

---

[11] Because Defendants are the prevailing party with regard to Plaintiffs' 42 U.S.C. § 1983 and related claims, Plaintiffs are not entitled to recover attorney fees and costs pursuant to 42 U.S.C. § 1988. *See* Complaint ¶ 41, at 11.

[12] "It is unquestionable that a non-moving party is not required to establish the existence of genuine issues of material fact for trial on matters not addressed by the summary judgment motion." *O'Toole v. Northrop Grumman Corp.*, 305 F.3d 1222, 1227 (10th Cir. 2002) (citing *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (noting that "[t]he substantive law at issue determines which facts are material [on summary judgment] in a given case.")). Defendants only argued there were no disputed issues of fact with regard to Plaintiffs' federal claims. Plaintiffs had no duty to provide the district court with a response on the state-law claims which Defendants did not address. Accordingly, summary judgment is granted only on the addressed federal claims.
    This Court, however, generally should decline to exercise supplemental jurisdiction over state-law claims when all federal claims have been dismissed. *See* 28 U.S.C. § 1367(c)(3); *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (stating that district court's exercise of supplemental jurisdiction over state-law claims is discretionary, but should generally be declined if all federal claims are dismissed before trial), *cert. denied*, 79 U.S.L.W. 3310, 3429, 3434 (U.S. Jan. 24, 2011) (No. 10-621). When the Court declines to exercise supplemental jurisdiction over state claims, § 1367(d) provides for at least a thirty-day tolling of the period of limitations ("unless State law provides for a longer tolling period") so that "state-law claims asserted under § 1367(a) will not become time barred while pending in federal court." *Jinks v. Richland County, S.C.*, 538 U.S. 456, 464 (2003). The Court notes that New Mexico's savings statute allows a party six months to commence a new suit as a continuation of a previous suit that has been dismissed for any reason except for "negligence in its prosecution." N.M.S.A. 1978, § 37-1-14. Accordingly the Plaintiffs may still raise the state-law claims that were asserted under §1367(a) in state court because those claims were brought in this Court before the statute of limitations expired.

**IT IS FURTHER ORDERED** that Defendants' state-law claims in Counts VI-X are dismissed without prejudice.

**SO ORDERED** this 16th day of March, 2011, in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
United States District Judge